SUSANA DE LA FUENTE BENÍQUEZ ET AL., Plaintiffs and Appellants, *v.* ANTONIO ROIG SUCRS., S. EN C., Defendant and Appellee.

No. 11737. Submitted December 11, 1957.—Decided May 2, 1961.

500

*Octavio Jiménez, Miguel Marcos Contreras* and *Pablo Defendini* for appellants. *F. González, Jr.* for appellee.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

In the case at bar[1] the trial court made the following findings on the evidence introduced:

---

[1] Even though the complaint in this suit was entitled "Denial of Servitude and Damages," the pleadings and the evidence clearly show there is no servitude in issue in its strict sense, but exclusively matters related to the relationship between certain co-owners. Our Civil Code specifically provides in its § 465 (31 L.P.R.A. § 1631) that "A servitude is a charge imposed upon an immovable *for the benefit of another tenement belonging to a different owner.*" (Italics ours.) Manresa makes it clear that the servitudes "can never exist upon things owned in co-ownership. A road that crosses different undivided tenements, even though absolutely necessary for the service and exploitation of the property, will not really represent for the co-owners a reciprocal servitude, for the latter is not

"1. That Susana de la Fuente Beníquez and Antonio Roig Sucesores, *S. en C.*, are owners of an undivided common piece of property of 111.60 cuerdas located at the ward of Juan Martín, Yabucoa, of which an undivided share of 98.35 cuerdas corresponds to Susana de la Fuente Beníquez and an undivided share of 13.25 cuerdas to Antonio Roig Sucesores, *S. en C.*

"2. That by virtue of deed No. 28 executed before the Notary Francisco González Fagundo on April 7, 1932, Susana de la Fuente Beníquez leased to the Yabucoa Sugar Co. her undivided share of 111.60 cuerdas of the property for a term of six years and four months, from March 1, 1937, with an option of one-year extension, Yabucoa Sugar Co. having been succeeded by a right of subrogation on said lease by Antonio Roig Sucesores, *S. en C.*, according to the contract of rescission executed between the parties and perfected by deed No. 93, executed before Notary Francisco González, Jr., on June 6, 1947, by virtue of which Antonio Roig Sucesores enjoyed said lease until June 30, 1947.

"3. That by deed executed before Notary Miguel Marcos Contreras on March 22, 1951, Rafael Pérez de la Fuente received as trustee an interest represented by a trust of $5,000 as value of the corresponding share of the plaintiff, Susana de la Fuente Beníquez, in favor of Annette and Vannessa Pérez de la Fuente Ortiz.

conceived except in property belonging to two or more owners and operating always for the benefit of one of them, the road, therefore, shall be considered as common and the co-owners shall possess it under an exclusive title of co-ownership." 3 *Comentarios al Código Civil Español* 508, 7th ed., 1952. See, also, Velázquez, *Los Derechos Reales Principales* 218, 1937; Texidor y Alcalá del Olmo, *Servidumbres*, 2 Rev. Jur. U.P.R. 159, 162–163 (1932). Nor is it fitting in this appeal to examine the relation of the property possessed in common by the parties and the rest of the tenements surrounding it, since there is no allegation and much less evidence of such relations, and the action is brought by one co-owner against the other, without the owners of the latter tenements being parties to the suit. Consequently, there is no basis for declaring that the property owned in common has been constituted in a servient tenement of another property or properties. See in this respect § 533 of the Civil Code (31 L.P.R.A. § 1824) which requires the consent of all the part-owners in order to impose a servitude on an undivided property, and *Serrano et al.* v. *Central Cambalache et al.*, 23 P.R.R. 608 (1916). In addition, the servitude of a railway track, being discontinuous and apparent, can only be acquired by virtue of a title. Section 475 of the Civil Code, 31 L.P.R.A. § 1653; *Picón v. Central Cambalache, Inc.*, 48 P.R.R. 495, 504 (1935), and cases cited therein. *Cf. Pabón* v. *Ayala*, 71 P.R.R. 878, 880 (1950).

"4. That on the property of 111.60 cuerdas located at the ward of Juan Martín, Yabucoa, owned by the plaintiff and the defendant as co-owners of the undivided property and in their corresponding shares, there lies a railway track owned by the defendant, Antonio Roig Sucesores *S. en C.*, which he uses for his own benefit as well as for the benefit of the property on which it is established, crossing said property from one end to another and which had been constructed before the execution of the contract of lease constituted by deed No. 28 of April 7, 1932, before Notary Francisco González Fagundo.

"5. That when the contract terminated in June 1947 and the plaintiff having acquired possession of her corresponding undivided share in said property and of the undivided share corresponding to defendant Antonio Roig Sucesores, *S. en C.,* the plaintiff did not object to the establishment of said railway tracks but, on the contrary, used it, since the property is basically devoted to the planting of sugar canes, for which compensation was due to the person who cultivated said farm in the measure of the quota assigned thereto.

"6. That the parcel of 111.60 cuerdas is at present leased to Luis Vila Santana, who pays a yearly rental of $25 per cuerda plus taxes and who pays said rental by virtue of the existence of said railway tracks used for hauling the canes.

"7. That the establishment of the railway tracks has caused no damages whatsoever to the immovable but on the contrary it has facilitated the hauling and delivery of the canes produced on said farm, and as well as transportation of fertilizers and farming materials, said railway tracks having been laid prior to the year 1921."

In view of the foregoing findings the trial judge decided, as a matter of law, that by keeping said railway tracks on a farm undividedly owned in common with the plaintiff, the defendant was exercising a right under § 328 of the present Civil Code,[2] using the thing "in accordance with the purpose for which it was intended" and without injuring the

---

[2] "Each participant may use the things held in common, provided he uses them in accordance with the purpose for which they are intended and in such a way as not to injure the interests of the common ownership, nor prevent the co-participants from utilizing them according to their rights." 31 L.P.R.A. § 1273.

interest of the co-ownership; that when the defendant established said railway tracks it did so with plaintiff's implied consent and in accordance with § 331 of the same Code; and that said railway tracks improved the farm. For these reasons judgment was rendered dismissing the complaint.

The plaintiff filed an appeal against that judgment and in her brief assigns several errors which, to her judgment, were committed by the trial court. In synthesis, she sustains that the tracks were not established with plaintiff's consent; that the tracks have injured the common ownership and that the plaintiff does not benefit from it; and that the aforesaid § 328 does not authorize the action of the defendant.

■■■ Section 331 of our Civil Code (31 L.P.R.A. § 1276) provides that "none of the several owners shall, without the consent of the others, make any change in the common property, though benefits for all may result therefrom." This is one of the fundamental rules provided by the Code supplementary to the agreements of the parties (§ 326) regulating common ownership. It is explained as part of a plan that: (1) authorizes each participant to use the things held in common in accordance with the purpose for which they were intended and without injuring the interests of the common ownership nor preventing its use by the other co-owners (§ 328); (2) authorizes the majority that represent the majority of the interests to take resolutions for "the management and better enjoyment of the thing held in common," which shall be binding on all (§ 332) ; [3] and (3) authorizes the making of changes in the common thing with the consent of all the co-owners (§ 331). It is, consequently, a plan of

---

[3] "The resolution of the majority of the participants as to the management and better enjoyment of the thing held in common shall be binding on all.

"A majority shall not be deemed to exist except when the resolution has been taken by the participants representing a majority of the interests which constitute the object of the common ownership.

"If no majority results, or if the resolution of the majority is seriously prejudicial to the persons interested in the thing held in common,

gradual granting of authority over the common thing by reason of the severe effects that might be worked on the thing or on the co-owners' rights by the different actions of one or some of the co-owners. And it is evident, of course, that even though it is sometimes difficult to exactly place the actions of the co-owners within one of these categories, these are always three autonomous and exclusive categories with different outlines, procedures, and juridical results, although they are all directed to maintain an integrated, pacific, and equitable system of common ownership.

We must, therefore, decide whether the establishment of a railway track by a co-owner on an undivided sugar cane estate constitutes the use of the thing in accordance with the purpose for which it was intended, or an administrative act, or a change in the common thing. We must remember that said action involves the conversion of a portion of the land devoted to cane growing (in this case one cuerda and a square) into a transportation track; the use of that property for the transportation of persons, machinery and railway cars for the hauling of canes and certain articles; and which, furthermore, requires certain measures (cleanliness, use of herbicides, etc.) to insure the continuous and efficient use of the tracks.

It seems clear to us that an act of such a nature and with such consequences cannot be considered as the use of the thing held in common in accordance with the purpose for which it was intended and which a co-owner may do on his own account without the participation of the others.[4]

---

the Superior Court, on petition of any of the parties, shall decree what may be proper, including the appointment of an administrator.

"When a part of the thing belongs privately to one or to several of the part-owners, and the remainder in common, the preceding provisions shall only apply to the part held in common." 31 L.P.R.A. § 1277.

[4] In *Díaz* v. *Plazuela Sugar Co.*, 31 P.R.R. 25 (1922), we apparently decided the contrary. However, a perusal of said judgment shows that the tracks were laid as a result of the demand of some tenants and with the consent of the owners, that the lessees continued to be in possession of the land, that they were not made parties to the suit, and

Neither our Civil Code nor the Spanish Code provides a definition for the phrase "in accordance with the purpose for which it was intended," [5] but the doctrine and case law sufficiently clarify its content. Said phrase limits the powers of the co-owners to use the common thing to the specified uses fixed by the community of property or generally admitted for the thing, whether by its nature or by its "traffic use." 3 Manresa, *op. cit.* at 541; Beltrán de Heredia, *La Comunidad de Bienes en Derecho Español* 232 (1954). Some examples taken from the case law and doctrine will make the previous explanation more precise: 1. A co-owner may not plow on its own account several pieces of common property to devote them to the growing of cereals when the purpose of the community is to devote the whole land to pasture and firewood. (Judgment of May 21, 1928 of the Supreme Court of Spain, 183 *Jurisprudencia Civil* 821); 2. A co-owner does not make the proper use of the thing in accordance with the purpose for which it was intended when he uses a turbine pump of a permanent installation as a trial pump. (*Chardón* v. *Laffaye,* 43 P.R.R. 623, 631 (1932)); 3. "The co-owners of a race horse may not use it to plow their lands or hitch their carts because . . . they are using it contrary to the purpose of the thing." (III, 1 Puig Peña, *Tratado de Derecho Civil Español,* s.f., p. 265); 4. A common fountain may not be utilized to use the water for other purposes not defined by the other co-owners (3 Manresa, *op. cit.* at 542); 5. The house for dwelling may not be transformed into a renting house (II, 2 Colin y Capitant, *Curso Elemental de Derecho Civil* 184, 3d ed., 1952). The previous examples and explanations seem sufficient to make it absolutely clear that the

what we really decided was that "in the absence of a showing of prejudice to the reversion, the right of action to have these tracks removed would belong to the tenants." (At 27.) Any expression of said judgment contrary to this criterion must be considered overruled.

[5] Neither are the management and alteration acts defined.

establishment of a permanent railway track on an undivided cane plantation and the necessary consequences of said act already mentioned cannot be catalogued in any way as the use of the common thing "in accordance with its purpose." Thus, the trial court erred when it decided the opposite.

It is also evident that the described actions may not be considered as administrative acts or of better enjoyment either. In the Spanish doctrine it is perhaps Puig Brutau who most pointedly traces the juridical outline of these acts: "In general terms we must affirm that administrative acts are those required to overcome the effects of the duration or lapse of time upon the value of things; they are, as we have said, the ones which preserve the present value of the thing, without binding it for the future. They are also those that permit a thing to increase in value as the circumstances permit it to benefit without need of taking any risk or suffering heavy loss. In any event, we believe that the qualification of an administrative act shall be made in the light of the consequences on the co-owners and not on the basis of the qualities abstractly attributed to it by the jurisprudence of concepts." 3 *Fundamentos de Derecho Civil* 268 (1953). And Castán properly explains that the two most important characteristics of said acts are: (1) those referring merely to the benefit or preservation of the thing or to the use of the rents; (2) to be of a transitory result. He relies on Planiol to conclude that those acts "have as a personal characteristic, not to bind the future except for a short time and therefore to be frequently renewable." 2 *Derecho Civil Español, Común y Foral* 351 (1957). The Supreme Court of Spain has classified the following as administrative acts: (1) the variety of work, machines, and openings of pits in a business of exploitation of some mines —Judgment of July 8, 1902, 94 *Jurisprudencia Civil* 39; (2) the distribution of a passive dividend among the co-owners to pay the common ownership debts—Judgment of

May 25, 1927, 175 *Jurisprudencia Civil* 298; (3) the distribution of the oil obtained from the olive picked in a common farm—Judgment of October 22, 1914, 131 *Jurisprudencia Civil* 487; (4) the extension of a contract for the benefit of forest products on various commonly owned farms—Judgment of June 30, 1897, 81 *Jurisprudencia Civil* 1307. The following are acts of ownership and not administrative acts: (1) the plowing of several pieces of common property to devote them to the growing of cereals when the common ownership was one of pastures and firewood of the whole immovable—Judgment of May 21, 1928, 183 *Jurisprudencia Civil* 821; (2) the crediting of some compensations voluntarily agreed upon by the parties—Judgment of June 20, 1917, 140 *Jurisprudencia Civil* 715, and (3) the recordable lease of more than six years—Judgment of June 9, 1913, 127 *Jurisprudencia Civil* 647. It seems clear to us that the act of installing a permanent railway track on an undivided property devoted to the growing of sugar cane and the results of said act, cannot be classified, in view of the foregoing, as an administrative act or for the better enjoyment.[6]

Consequently, we must, by elimination of the other two categories, and as we shall forthwith explain by its juridical configuration, classify said act as one of alteration of the common thing. These are acts of material disposal that "imply a change in the use and enjoyment or in the substance and integrity of the thing, which may modify its purposes and nature and which mean an extralimitation of the powers that legally correspond to each owner." Beltrán de Heredia,

---

[6] Beltrán de Heredia considers the concept "better enjoyment" as one that is "intermediate, limited, on one side, by the simple management, as an act of management, and, on the other side, by the alteration. It entails the realization of changes or modifications that affect the way of enjoyment . . . but that do not cause an alteration in the substance and nature of the thing." *Op. cit.* at 311. Even assuming that such interpretation is correct, our conclusion would not be altered, because as the aforesaid author himself explains, in the acts of better enjoyment "the purpose of the thing must be respected" and therefore acts that suppose an alteration of the thing shall not be included.

*op. cit.* at 279. The commentators explain that an alteration means a change in the purpose of the common thing or modification of the form, substance or matter of the thing (Beltrán de Heredia, *op. cit.* at 285) ; a change in the conditions in which the other co-owners believe the thing should remain or a change in the use to which they wish to devote it (Fornari, in Beltrán de Heredia, *op. cit.* at 283) ; a denaturalization of the purposes and use of the undivided thing (Manresa, *op. cit.* at 598) ; a change in the essence or form of the thing (7 Scaevola, Civil Code 396, 4th ed. 1943) ; something new which may modify and limit and above all, impair the condition or enjoyment thereof by others (3 Sánchez Román, *Estudio de Derecho Civil* 180, 2d ed. 1909) ; an act that must be juridically labelled as an act of disposal and which includes those of mere intervention de facto in the common thing when they might imply substantial alterations therefor (Puig Brutau, *op. cit.* at 269) ; an act that modifies the form or substance (especially the purpose) of the common thing (2 Barassi, *Instituciones de Derecho Civil* 60, 1955) ; any act of disposal or of management that substantially modifies the status of fact or of law of the thing in a way that thereafter it cannot be said that the thing is as it was (1 Ruggiero, *Instituciones de Derecho Civil* 589, 4th ed.).

The examples we have cited when describing the administrative acts and of use in accordance to its purpose, show, in a negative as well as in a positive way, what the case law and doctrine consider as alterations of the common thing. To them we may add the following: to construct on a property devoted to farming; to convert a ship destined to transportation into a storage place, or a residential house into a show place; to fell trees from a woodland for firewood instead of picking the fruits (Beltrán de Heredia, *op. cit.* at 283–84). The Supreme Court of Spain in pursuit of suitably protecting the interests of all co-owners, held in its

judgment of September 25, 1896, 80 *Jurisprudencia Civil* 195, that when a porch railing is substituted by a glass enclosure, thereby depriving the view to the street of one of the co-owners in a building, an alteration is made because "even when alterations are more or less limited to slight changes which do not vary the object and use to which [the common thing] was devoted, they cannot be made if they cause any prejudice to the common property or prevent the co-participants from using it according to their right" (pp. 198-99).

The foregoing explanation would be sufficient to dissipate any doubt on the matter submitted to our decision. It is convenient to add, however, that in our country we have considerations of exception that definitively confirm the foregoing. The sugar industry being subject to extensive federal and state regulation, a change in the production or in the procedures may significantly affect the economy of an estate. Thus, in this case the alteration made may affect the production quota assigned to the property under the Federal legislation, or the compensation for hauling and delivery of the canes authorized by local statutes. It is evident that a change that brings about such results cannot depend on the will of one of the co-owners nor on the majority of them, but requires the unanimous consent,[7] because of all its effects on the common thing and its economy.

 In several jurisdictions the commentators have discussed to some extent the problem of whether the consent required to make alterations in the common thing may be implied. It is practically unanimous that it may be so. In this, as in many other questions, the old Roman rule still prevails and time has confirmed its wisdom.[8]

---

[7] It must be remembered that by express provision of § 331, it is necessary to have the consent of all the co-owners, even though from the alterations "benefits for all may result therefrom."

[8] Digest, Book X, Title III, Law 28: "PAPINIANO: Book VII *Cuestiones*, Sabino says, that none of the owners have any right to do anything with the common thing against the will of the other. Therefore, it is

It is Manresa who more elaborately and with greater clearness explains the matter.

" . . . But, will it be necessary for the co-owner to give notice to his partners, assuming to the contrary, that consent has not been granted? We think not. It is not required by the Civil Code, because the sanction of the acts performed by one of the co-owners does not depend exclusively on the previous notice that may be given by whomever performed the act to the other co-owners, but that all the co-owners consent to the performance of the act. Thus, not only the express consent, but also the implied consent duly proved is sufficient in the matter.

"But, nevertheless, the co-owner's responsibility in regard to his acts will never remain the same in reference to the interests of the common property. If the other co-owners had knowledge of the work which was being constructed in their presence, they cannot demand the demolition of the thing built, if they did not use at the right opportunity the ordinary or extraordinary actions provided for such end. The truth is that it cannot be said there is an express consent; but as the Romans said, *is qui potest prohibere et non prohibet, tacite consentire videtus*, 'he who can but does not prohibit impliedly consents.' By virtue of said implied consent, the co-owner who erected the construction has no action to recover expenses, because they were not and could not have been subject to the presumptive consent, nor do the other co-owners have a right to ask for the demolition of the constructions which they could have but did not prohibit, but if the common property should have suffered any damages, the latter may recover by means of the corresponding action and, in the proper case, by the division of the common thing against the co-owner who made the alterations. This theory which was the Roman theory is based on the following:

evident that there is a right to prohibit it; because it is known that under equal circumstances the status of the one who prohibits is better. But although in a common thing a partner may prohibit its co-partner from doing something, however, he cannot be compelled to destroy what has been done, if he did not prohibit it when he could do so; and therefore, he may recover damages by the division of the common thing. But if he gave his consent to the one doing it, he has no action not even for damages. But if in absence of his partner he built something that is harmful to said partner, he is compelled to demolish it." 1 García del Corral, *Cuerpo del Derecho Civil Romano*, 637 (1889).

'1st—That the implied consent may and should be presumed as to the execution of the work, which could have been but was not prevented.

"2d—That said implied consent does not embrace the expenses of the construction, because they were disbursed by the co-owner as he thought most opportune, without consulting the will of the others, which could have been contrary to the amount and to the mode, more or less economical, of incurring them.

'3d—That if by acts juridically imputable to the co-owner, who on his own account carried out the modifications in the common thing, the common property was damaged, it is just that he be civilly liable for the damages.' " 3. Manresa, *op. cit.* at 602–604.

Likewise, Scaevola,[9] Puig Peña,[10] Sánchez Román,[11] Beltrán de Heredia,[12] and Borell y Soler,[13] hold the same view upholding the validity of the implied consent. Other Spanish commentators are silent upon such matter.[14] In

---

[9] *Op. cit.* at 396–97:

"The consent is the expression of the conformity of a person with the act or contract sought to be performed, and it must be express, that is, it must be stated directly and unquestionably. Does this mean that the implied consent shall not be valid? No. The former is more convenient; but this does not imply that the latter is lacking validity if its granting is established. If the co-owners know about the modifications of the thing and do not oppose it but, on the contrary, permit it to be carried out, it is unquestionable that they will not be able to allege lack of consent, even though they have not granted it solemnly. The same happens in the case of an inheritance. There is the express and tacit consent; the former is granted by public or private document; the latter is granted by acts that necessarily infer the will to accept, and either one produces the same results. We, therefore, consider, that the consent required by the aforesaid article exists: first, when it is stated in a document; second, when being aware of the alteration by one or some of the co-owners, the others do nothing to prevent it from taking place."

[10] *Op. cit.* at 266, n. 20.

[11] *Op. cit.* at 180.

[12] *Op. cit.* at 289–293, and especially p. 292.

[13] *El Dominio Según el Código Civil Español* 208 (1948).

[14] See 2 Castán *op. cit.* at 347–348; 3 Puig Brutau *op. cit.* at 269; 1 De Diego, *Instituciones de Derecho Civil Español* 610 (1959); 2 Valverde, *Tratado de Derecho Civil Español* 256–259 (1925).

France the jurisprudence and doctrine [15] approve the implied consent. Several Italian commentators [16] are of the same opinion.

Furthermore, an eminently practical principle buttresses this solution. It would prove very difficult to regulate the community of property if we were to add to the severe rule that requires the unanimous consent to authorize alterations in the common thing, the requirement of express consent, with the formalities that are generally required in order that said act be established with certainty and not be subject to the contradictions of oral evidence. A solution that requires the unanimity of wills but which at the same time authorizes the manifestation of either express or implied consent, offers to the co-owners the necessary protection against unilateral transformations or alterations in the common thing and also permits a desirable flexibility in the procedure. This is a case in which the historico-conceptual point of view and the point of view of the interests involved justify the same solution. For the foregoing reasons, we hold that § 331 of the present Civil Code authorizes the implied consent to permit alterations in the common thing. Of course, in each case it will be incumbent on the court to determine, in the light of the evidence, whether or not such consent exists.

The findings show, without any doubt, that the plaintiff in this case gave her implied consent to the establishment of the railway tracks. The evidence does not show exactly when the railway tracks were established in the common property. But we do know that a witness, at present a tenant of the property, testified without being contradicted, that the tracks existed on the property "in the same conditions" as at present since 1918, in which year he arrived at Yabucoa; for the same reason another witness.

[15] 3 Planiol-Ripert, *Tratado Práctico de Derecho Civil Francés* 254 (1942); 10 Aubry y Rau, *Droit Civil Francais* 548 (1935); Colin y Capitant do not discuss the matter—*op. cit.* at 183–185.

[16] Ruggiero, *op. cit.* at 588 n. 1.

knows of the tracks since 1921; the present administrator of the defendant has personal notice of the tracks since 1926; and plaintiff's son who is her only witness admitted that in 1937 they knew that it "existed." In the answer to an interrogatory served by the defendant and which constitutes admitted evidence, the plaintiff accepted that the property had always been owned by her and the defendant in undivided common ownership, and that she had knowledge of the existence of said tracks "since the time they were established." The evidence shows, also, that from 1932 until 1947 the plaintiff leased to the defendant her share in the common property, and on two occasions she expressly authorized him to establish permanent and portable railway tracks and to transport by them its own canes and those of other persons "without having to pay anything on this account to their owner"; and that from 1947 until 1952 the plaintiff leased that portion of defendant's property and maintained and utilized the tracks; and that since 1952 she sublet the whole property with the tracks to another person, who also continued using them in the same manner it had been previously used. The plaintiff's witness testified that when the lease contract was signed with the defendant in 1947, a clause, proposed by Mr. González, attorney for the defendant, which authorized the permanent establishment of the track, had been objected to and eliminated. This testimony, of course, does not eliminate the actions of the plaintiff of not preventing or prohibiting the establishment of the tracks prior to 1937, and of using them after 1947. Moreover, the defendant's administrator emphatically denied that the plaintiff had ever requested the removal of the tracks, and Mr. González testified on the witness stand that when the deed was drawn up in 1947 he had made no reference to the tracks. The deed of 1947 makes no mention of the tracks whatsoever. The trial judge, in his responsibility of weighing the evidence, decided that those objections or requests had not existed.

The evidence shows, in brief, that for a long time the plaintiff knew of the establishment of the tracks and of the specific uses given to them, that for fifteen years, with the tracks already in existence, she leased to the defendant her undivided share of the property; that on one occasion, in her dual capacity as owner and lessee, and for various years, she used the tracks; that subsequently she subleased the property to another person with the tracks; and at no time until she filed the complaint, she had objected to or prohibited the establishment and use of the tracks. We believe that due to the relations existing between the parties, said conclusive acts brings us face to face with a case of implied consent, pursuant to the aforesaid explanations on the subject, and not with a simple act of tolerance, as suggested by the plaintiff.[17]

---

[17] It is unnecessary to decide in this case whether silence in itself or the mere absence of prohibition, when it could have been alleged, constitutes, under all the circumstances, a case of implied consent. We shall leave that problem for a better occasion. A judge, having before him a matter of this nature, must take into consideration the circumstances as a whole in order to render judgment. Ferrara explains:

"Adopting the objective criterion, we must make it clear that notwithstanding the apparent meaning of the terms ('express' and 'implied'), whose use seems to be already established and, in any event, is the most common an express manifestation is even that manifestation made by signs and gestures equivalent to language while on the contrary, an implied manifestation, although it cannot be reduced to absolute silence, may consist either of facts or acts, or of true and real negotiable declarations of the will but with diverse contents, which nevertheless allow the inference of the existence of another negotiable will (for ex., the declaration of novation of an obligation from the *de cuius* made on his own behalf by the heir is tantamount to an implied manifestation of acceptance of the inheritance).

"Finally, the test for determining the congruence or incongruence of the behavior in the implied manifestations is doubtful. But one pivotal point for all is that the fact must be univocal, that is, incompatible with a contrary will to that from which it is inferred. Furthermore, we can also call a pivotal point—although less specified by a part of the doctrine—this: it is necessary to judge the behavior as a whole and on the basis of the entire circumstances under which they have occurred. But must the incompatibility with an opposite will be absolute, or merely relative? The former thesis, too rigorous, would render difficult or impossible an

 The previous judgment, however, does not entirely decide the problem. It undoubtedly makes clear that the plaintiff has no right to require the removal of the

implied manifestation of will. The latter, is preferable which seems to be the one adopted by the law itself; therefore, it is necessary to judge the conclusive character or not of a certain behavior on the basis of the predominant concepts in the business life." *El Negocio Jurídico* 337–338 (1956).

See, in general, 2 Puig Brutau *op. cit.* at 81–90; 2 Savigny, *Sistema del Derecho Romano Actual*, 291–298, 2d ed.; García Montes, *Formas de Manifestación de la Voluntad*, 1 *Revista Trimestral de Derecho Privado* 5 (1924). See, also, the brilliant judgment of the Supreme Court of Spain, of November 24, 1943, 4 *Jurisprudencia Civil* (Second Series) 417, delivered by Magistrate José Castán, and from which we quote the following:

"The delicate and often discussed problem of the juridical value of the abstentions must be weighed cautiously, as, in principle, silence, because of its own negative nature, cannot be deemed to express a will, and although the modern scientific doctrine often admits that, in some cases, silence is liable to be interpreted as consent and, hence, as a manifestation of wanting, based on the simple idea that silence may serve as proof or presumption of will, or rather grounding said conclusion on the theory that silence may be the source of a substitute liability of the will, since the practical necessities sanctioned by use require the sending of an answer to certain persons (particularly if the relations with them are of a continuous business nature), and if this is not done, prolonged silence amounts to a fault which may be deemed to be cured by treating the one who kept silent as if he had accepted, it is necessary, in any event, to bear in mind: 1st—that the doctrine has not yet established in this matter general rules of acceptance sufficiently safe and accurate that have, in addition, the proper adjustment to our positive set of laws; and 2d—that if because of its past and present dissemination the ancient point of view is accepted to the effect that silence amounts to a declaration when, in view of a specific relationship that exists between two persons, the ordinary course of behavior implies the duty to speak, since if he who can but does not speak, shall be considered as consenting, assuming good faith (*qui siluit cuum loqui et debuit et potuit, consentire videtur*) it shall be necessary, in order to consider silence as an expression of consent, that there exist the concurrence of these two conditions: one, that he who remains silent 'may contradict,' which presupposes above all, that he has had knowledge of the facts giving rise to a possible protest ('subjective' element), and another, that he who remains silent 'had the obligation to answer,' or, at least, that it ought to be natural and normal for him to state his dissent, if he did not wish to approve the facts or proposals of the other party ('objective' element)."

Finally, see the judgment of June 8, 1955 by the same court, 51 *Jurisprudencia Civil* (New Series) 791, in which the implied consent and

tracks.[18] There remains to consider, nevertheless, whether the common property suffered any harm due to the installation and use of the tracks and for which the defendant is responsible even if it had acted with the plaintiff's implied consent. The trial judge decided that no such damages were caused and, on the contrary, the tracks benefited the property. The plaintiff challenges said findings.

The evidence in the record shows the following:

1. The tracks crosses the property, is nine meters wide and occupies as a whole one cuerda and a square of tillable land which would produce 60 tons of canes and a profit of $4 per ton. For at least two years the property enjoyed a cane quota which it produced fully, and therefore, the land of the tracks would have to be devoted to other crops, if the tracks did not exist. The evidence of the plaintiff did not specify what crops profits could be obtained, if any.

2. People cross over the tracks; the defendant sprays herbicides; and there is the danger of a fire due to the sparks from the locomotives. No evidence was presented of specific damages due to these reasons.

3. Since 1947, the plaintiff leased the defendant's share at a yearly rental of $15 per cuerda,[19] and since 1952 she has subleased the entire property to another person for an annual rental of $25 per cuerda, which is one of the most "favorable" prices ever paid on said zone.

4. The plaintiff's witness testified that the track harmed the property;[20] three witnesses of the defendant, including the

tolerance are examined in connection with the change of the purposes of a leased thing.

[18] The reason is evident. Once the alteration was agreed by all co-owners, it becomes part of the common thing and its removal would be an act of material disposal which in turn would require the unanimous consent.

[19] At that same price the plaintiff had leased her share of the property to the defendant prior to 1947.

[20] The witness relied on the reasons stated in paragraphs 1 and 2 supra. Furthermore, the plaintiff attempted to show that instead of having a permanent track it would be more advantageous to the owners of the property to receive the compensation for hauling and transportation of canes that the present act requires the mills to pay the colonos; but she

present lessee of the property,[21] maintained the contrary. This latter view is based on the facilities for the hauling and transportation of the canes and for the delivery of fertilizers and farming materials that the permanent track offers to the property and on the fact that if said track did not exist, portable tracks would have to be established and connected to a permanent track located two hectometers away from the farm.

It is evident that the described evidence upholds the conclusion of the trial court to the effect that the plaintiff did not prove that the installation and maintenance of the tracks had caused damages to the common thing. For well-known reasons we shall not alter the weighing of the evidence.[22]

We must, finally, turn our attention to another damage element which appears from the evidence. The witness for the plaintiff, as well as the defendant's administrator, testified that the latter used the tracks not only to serve the needs of the common property, but also to transport annually thousands of tons of canes coming from other plantations,[23] and which were destined to the defendant's mill.

There is no doubt that the defendant was barred, under § 328 of the Civil Code, from using the common thing, with or without the tracks, for its own and exclusive benefit and without an adequate compensation to the community of property. As the Supreme Court of Spain explains, the co-ownership "consists in the free enjoyment of the [common thing]

did not present the specific elements of proof relating to said property in particular, to support the finding mentioned.

[21] The lessee, Luis Vilá, testified that the tracks "aside from the quality of the land," was one of the elements he considered when renting the property.

[22] Our judgment should not be understood as an acceptance that the plaintiff could obtain compensation *as a matter of law*, for all damages that in her opinion had been caused to the common thing. Therefore, there remains open to further discussion the problem as to which are the damages caused to the common thing for which a co-owner is responsible when he makes alterations in the common thing with the other co-owner's implied consent.

[23] The plaintiff's witness estimated a total of 13,800 tons; defendant's said that they were "probably 10,000 or 12,000 tons."

and of its fruits by all its participants in equal shares, or in proportion with their respective shares without any further limitations than those needed to attain the better and most equitable enjoyment, and . . . excludes the exclusive enjoyment of the common thing or any part thereof for the individual benefit of one of the co-owners." Judgment of June 22, 1892, 71 *Jurisprudencia Civil* 805, 811–12. This is, unmistakably, one of the principal rules of a peaceful and just system of the community of property.[24]

However, although the plaintiff proved that the defendant had used the tracks for certain activities of its exclusive benefit, she did not present the necessary elements of evidence that would have permitted the trial court or this Supreme Court to fix the compensation for said damages. *Boria v. The Maryland Casualty Co.*, 60 P.R.R. 808, 813 (1942); *Sánchez v. Cooperativa Azucarera*, 66 P.R.R. 330, 335 (1946). In effect, the record merely contains the afore-cited testimony about the amount of tons of canes that came from other plantations and which were transported, for its own advantage, by the defendant on the tracks of the community. We have no information of any kind on which we may make an estimate of the sum that should have been paid to the community for such services, taking into account, for example, the distance and fee usually paid in such cases. We would be acting merely on speculative and arbitrary bases if we undertook to fix the compensation without evaluating those elements. Of course, we cannot do so.[25]

Judgment appealed from will be affirmed.

---

[24] See, also, Judgment of June 26, 1951, 35 *Jurisprudencia Civil* (New Series) 502; 3 Manresa *op. cit.* at 542; Puig Peña, *op. cit.* at 271; Beltrán de Heredia *op. cit.* at 238–242; Scaevola *op. cit.* at 312–321.

[25] In view of this judgment, we left aside the problem of whether or not the plaintiff was entitled to receive compensation for the defendant's activities, already described, and which took place from the date the plaintiff had control of the property and, hence, of the tracks, in her dual capacity as lessee and co-owner, and when she took no step, prior to this complaint, to prohibit or prevent the transportation of the canes from

MR. JUSTICE BELAVAL, dissenting.

Section 328 of our Civil Code provides that a co-owner may "use the things held in common, provided he uses them in accordance with the purposes for which they are intended and in such a way as not to injure the interests of the common ownership, nor prevent the co-participants from utilizing them according to their rights." Section 331 provides that "none of the several owners shall, without the consent of the others, make any change in the common property, though benefits for all may result therefrom."

The facts of this case are as follows: the defendant-appellant Antonio Roig Sucrs. *S. en C.* owns an undivided share of 13.25 cuerdas, of a common property consisting of 111.60 cuerdas, the rest of which is owned by the plaintiff, Susana de la Fuente Beníquez. Without any agreement whatsoever between the parties (t. 67) the defendant company has a railway track across the property owned in common, which it uses for the hauling of sugar canes planted in the property owned in common and in other properties that have nothing to do with said property.

In the opinion of the majority, the Court apparently has made the finding that as the minority of the common property has used the property owned in common, according to the purpose for which they were intended and in such a way that does not impair the interest of the common property, nor prevent the co-participant from utilizing it according to his rights, and has made an alteration with the plaintiff's implied consent, said tracks cannot be removed, despite the fact that the majority of interests of the common property has so requested it.

It is difficult to believe that the establishment of a land transportation system is the use "in accordance with the pur-

other plantations. It is not necessary either to express any opinion as to which rights would accrue to the parties in the event of the division of the community, since the petition does not request such a division.

pose" which § 328 authorizes and which assumes a natural use, without "alteration," such as the use of water, pastures, trees, minerals, land preserved for hunting, not covered by special regulation and in special cases of municipal properties or cooperatives. It is hard to believe that the space occupied by a cane railway which crosses from one property to another is the same as a crop alley in an agricultural tenement. It is hard to believe that to keep two sides of the property open to give way to a cane railway, does not impair the interest of the majority of the co-owners, nor prevents the use of the property according to their rights, including the fact of devoting it to other purposes.

The evidence shows that the defendant company—co-owner of less than one-tenth—transports the canes from other properties by means of the tracks laid on the common property to grind them in the sugar mill owned exclusively by the defendant company. Mr. Roig, defendant's own witness, admitted that: "aside from the cane produced on said property (owned in common) it transports on said tracks canes from other colonos to the other side . . . probably 10,000 or 12,000 tons . . . and that for the use of said tracks . . . there is no agreement." (T. 65–67.) The plaintiff established by the testimony of a witness, which was not controverted, that a path has been established alongside said tracks, a path of the Yabucoa Sugar Company (company owned, or operated by the minority co-owner, defendant herein); that the property has lost its "privacy"; and that there is really no control and that the employees of the other tenements go in and out whenever they feel like it, and that machines, all kinds of machines, pass through the property owned in common; including those that irrigate herbicides to kill the grass on the tracks. Thus there is no doubt that the function of the property owned in common in regards to the other properties that do business with the minority of the common property, is one of a servient tenement, with-

out even a verbal agreement from the interest of the majority in the common property. As may be noted, the action for denial of servitude brought by the majority of the co-owners, is not so lacking in value as the majority of this Court has decided.

Assuming, without deciding, that the use of the strip of land through which the railway tracks operated by a single minority co-owner, crosses, were an "alteration" as the one mentioned in § 331, which could be made valid by the implied consent, it would undoubtedly be an *administrative act* for the better enjoyment of the thing and not an *act of alienation* which partakes of the character of a servitude in favor of a minority interest. I believe that there can be no doubt that an administrative act, no matter the degree of implied consent justifying it, is essentially transitory and it is sufficient for the majority of a common property to express its disagreement to its continuation, to consider the act automatically revoked. It would be necessary to also determine further whether the administrative act affects the substance and form of the thing. 2 Castán, *Derecho Civil Español, Común y Foral* 348–349 and 350–351 (ninth edition, Editorial Reus of 1957). There is no doubt that the establishment of a railway track which creates an encumbrance or use contrary to the general enjoyment or limited to the personsal benefit of the person enjoying it, or which converts a closed property into an open property, affects the substance as well as the form of the thing owned in common.

The opinion of the majority does not speak of the character of the right of way which the implied consent has created upon the property owned in common. Undoubtedly a right of way, no matter the juridical relation within which it is established, constitutes at least an encumbrance which partakes of the nature of a servitude. So much so, that the court has refused to remove the tracks as if it were a real right established upon the thing.

The law prohibits the establishment of a servitude upon an undivided tenement without the express consent of all the co-owners—§ 533. That is why Castán includes among the limitations of the right of the co-owners in relation to their share or quota, that of not imposing "a servitude on an undivided tenement without the consent of all the part-owners" —at 349. We must assume the same attitude when dealing with a right of way which somehow partakes of the nature of a servitude. It should not be considered that an implied consent is sufficient to establish a real right of discontinued servitude, whether of way or of railway, as it is not a right acquired by prescription or mere tolerance and needs a written title. Section 475—31 L.P.R.A. 695, § 1653. See the glossary of our case law cited on pages 696–698. We must adopt the same attitude when dealing with a right of enjoyment which partakes of the nature of a servitude. I feel relieved from the obligation of discussing the difference that exists between an improvement and a servitude.

Summary: If it is a mere verbal authorization for the particular use by a minority co-ownership of part of the property owned in common, the same is essentially transitory and the expression of will of the majority interest in the common property is sufficient to terminate the authorization, even though benefits for all may result therefrom: § 331. If it is the establishment of a real right which partakes of the nature of a servitude, the implied consent of all the co-owners is necessary: § 533.

In view of the foregoing I regret to dissent.